IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MELANIE E. DAMIAN, as
Receiver for PFGBI, LLC,

     Plaintiff,

v.

NELSON MULLINS RILEY &
SCARBOROUGH, LLP, J.
BRENNAN RYAN, and JASON R.
WOLFERSBERGER,

     Defendants.

CIVIL ACTION FILE

NUMBER 1:14-cv-3498-TCB

## **O R D E R**

This case comes before the Court on the parties' amended cross-motions for summary judgment [89 & 90].

## I. **Introduction**

This lawsuit is one of several stemming from the exploits of Aubrey Lee Price, a financier-turned-fraudster who over the course of several years lost millions of dollars of his investors' money. In 2012, he confessed to his wrongdoing, faked his own death, and disappeared for eighteen months, only to be discovered alive on New Year's Eve in 2013.

The facts giving rise to this case relate to a December 31, 2010 transaction in which PFGBI, LLC—an investment company founded by Price—paid $10.2 million to acquire a controlling interest in Montgomery County Bankshares ("Bankshares"), the holding company for Montgomery Bank & Trust ("MBT" or the "Bank"). After the deal closed, the Bank operated for a year and a half before it was shut down by regulators in July 2012, shortly after Price's confession and disappearance. PFGBI lost the entirety of its investment.

Plaintiff Melanie Damian is the receiver for PFGBI and several other entities through which Price's dealings were carried out, including PFG, LLC and PFG Asset Management, LLC (collectively with PFGBI, the "PFG Entities"). In an attempt to recoup some of the losses suffered by PFGBI's investors, she filed this lawsuit against the lawyers who represented PFGBI in connection with the Bankshares transaction—Defendants Nelson Mullins Riley & Scarborough, LLP and two lawyers with the firm, Brennan Ryan and Jason Wolfersberger.[1] Damian brings

---

[1] At all relevant times, Ryan was a partner at Nelson Mullins and Wolfersberger was of counsel to the firm.

claims for legal malpractice and breach of fiduciary duty against all three Defendants, and she asserts a claim for breach of contract against Nelson Mullins alone. At its core, Damian's complaint alleges that had Defendants not failed to conduct adequate due diligence, particularly with regard to the Bank's financial health, PFGBI would never have invested in MBT and would not have lost that investment when the Bank was later closed.

Presently before the Court are cross-motions for summary judgment. Defendants move for summary judgment on all of Damian's claims, arguing that they breached no duty owed to PFGBI and that even if such a breach did occur it was not the proximate cause of PFGBI's losses. Damian cross-moves for partial summary judgment as to duty and breach, but she contends that questions of fact preclude the granting of summary judgment to either party on the issue of proximate cause.

As discussed below, the existence of genuine issues of material fact precludes summary judgment in favor of either party with respect to the scope of the duty owed by Defendants to their client. But even if

the Court were to grant summary judgment in favor of Damian on the issues of duty and breach, the undisputed evidence of record compels the conclusion that PFGBI's losses were not proximately caused by any negligence on the part of Defendants. Accordingly, the Court will grant Defendants' motion for summary judgment and deny Damian's.[2]

## II.   Factual Background

### A.   Price Forms PFG and Later Seeks a Distressed Bank in Which to Invest

In 2008, after seven years of working as a financial and investment advisor at two national banks, Aubrey Lee Price formed an investment fund named PFG, LLC. PFG began soliciting funds from investors in June 2009, and it would eventually raise more than $50 million from 115 investors, among them Daniel McSwain, Daniel's son Keith McSwain, and Mike Gunter.

By June 2010, Price and some of his PFG investors, including Gunter and the McSwains, had become interested in investing in a

---

[2] Damian also moved for summary judgment with respect to four affirmative defenses asserted by Defendants. Because the Court finds that Defendants are entitled to summary judgment on the issue of proximate causation, it need not address that aspect of Damian's motion.

4

distressed bank. At the end of the next month, they would form PFGBI as the vehicle through which to carry out that investment, but even before PFGBI was formed, Price began narrowing down possible targets for the investment. Eventually the investors settled on MBT, a troubled community bank in Montgomery County, Georgia.

### B.   The October 2009 Cease and Desist Order

In October 2009, MBT had been made the subject of a cease and desist order (the "C&D Order") issued by federal and state regulators. The C&D Order found that MBT had engaged in numerous unsafe and unsound banking practices, including following hazardous lending policies and operating in such a manner as to produce insufficient earnings to support operations. [54-20] at 2.[3] With respect to MBT's loan portfolio, the C&D Order noted that the Bank had a large volume of poor quality loans and that its allowance for loan and lease losses ("ALLL")—a reserve fund set aside by the Bank to cover estimated probable losses within the Bank's loan portfolio—was inadequate. *Id.*

---

[3] Throughout this Order, except with regard to citations to depositions and the parties' briefs, citations to page numbers refer to the page of the PDF document filed with the Court's Case Management and Electronic Case Filing (CM/ECF) system, not to any page numbers appearing on the cited documents themselves.

The C&D Order imposed numerous requirements on the Bank relating to improving its management, strengthening its loan practices and portfolio, increasing its tier 1 capital ratio,[4] and properly funding its ALLL allowance. *See id.* at 3–18.

It is undisputed that Price reviewed the C&D Order in or prior to June 2010, well before PFGBI invested in MBT.

## C.    The Kline Report and PowerPoint Presentation

In December 2009, John Kline—a former bank examiner hired as a consultant by MBT pursuant to the requirements of the C&D Order—prepared a report of a strategic planning session held by the Bank's directors.

The Kline report identified as some of MBT's weaknesses its "excessive level of problem loans," its high concentration of real estate loans, the existence of regulatory sanctions, the need for better training,

---

[4] As explained by Defendants' expert Ian Ratner, "Tier 1 Capital is a core measure of a bank's financial strength and is comprised of book equity capital less certain minor adjustments." [53-16] Ex. 323 at 17 n.32; *see also* FDIC, RISK MANAGEMENT MANUAL OF EXAMINATION POLICIES § 2.1-1 (noting that "tier 1 capital is the most loss-absorbing form of capital," and "any insured depository institution with a tier 1 capital to total assets ratio of less than 2 percent may be deemed to be operating in an unsafe and unsound condition").

6

the need to raise additional capital, and the overall economic situation. [53-7] at 69. It listed threats to the Bank as, among others, an "inability to attract more capital in this economy," the failure of board leadership to evolve, the risk that the Bank's liquidity could worsen, other real estate losses, and the prolonged downturn in the economy. *Id.* at 70.

In March 2010 Kline prepared a PowerPoint presentation titled "Montgomery Bank & Trust Five Year Financial Projections." *Id.* at 49–55. That presentation summarized the Bank's poor financial state— with non-performing loans and other real estate owned ("OREO," or simply "REO")[5] representing twenty percent of MBT's assets and more than 400 percent of its capital—and it predicted that MBT would suffer significant additional losses between 2010 and 2013. To fund those anticipated losses and maintain required capital, Kline recommended that the Bank immediately raise $7.5 million in new equity and take actions to cut its expenses.

---

[5] REO is one of the metrics (among others) used to assess a bank's financial health. It appears as a line item on an institution's financial statements, and it represents non-earning real estate owned by the bank, such as property acquired through foreclosure proceedings.

Price was given the Kline report in June 2010, before PFGBI invested in MBT. Kline's PowerPoint presentation was also given to Price at some point, although it is unclear precisely when. A copy of the presentation contained in Price's files bear Price's handwritten (but undated) notes that read "John (regulatory consultant)," "read consent order," "Trey," "Steve Powell & Co.—Loan Review," "15 million," and "loan loss reserves." *Id.* at 49–51.

### D.    The April 2010 Offering Memorandum

In April 2010, Bankshares responded to the recognized need to raise new capital by issuing an offering memorandum (the "offering memorandum" or the "PPM") that contemplated the issuance of 100,000 shares of common stock at $100 per share. The PPM, which Price reviewed in June 2010, disclosed that MBT's "business, financial condition and operating results have been and continue to be significantly affected by ongoing disruptions in the real estate and capital markets," and it expressly noted that the purpose of the offering was to "supplement [MBT's] capital base" and "address[ the Bank's]

8

nonperforming assets and . . . the potential for continued deterioration in [its] loan portfolio." [54-19] at 4, 7.

Attached to the PPM were MBT's audited financial statements for 2007 and 2008, as well as its unaudited financial statements for 2009. The PPM also summarized key components of the Bank's financial condition. For example, it explained that as of December 31, 2009, MBT's tier 1 capital ratio was 6.09 percent, almost two percent less than the level required by the 2009 C&D Order. *Id.* at 8. It also disclosed that between 2008 and 2009, MBT's non-performing assets had more than tripled in value, from $13.4 million in December 2008 to $49.5 million in December 2009. Non-performing loans had been valued at $7.9 million in 2008 but increased by more than 275 percent to $29.7 million in 2009. The Bank's REO had likewise grown from $5.5 million in 2008 to $19.8 million in 2009, an increase of 260 percent. *Id.*

The offering memorandum outlined nine pages of "risk factors" that could potentially affect the Bank's operations. *Id.* at 14–22. These factors included regulators' enforcement action against the Bank and capital requirements, the deterioration of the housing market, MBT's

significant number of development and construction loans, the poor state of the local economy, and the possibility that MBT's ALLL reserve would not cover the Bank's actual loan losses. The PPM expressly stated that due to the anticipated continued problems in the housing market, "additional downgrades, significant provisions for loan losses and charge-offs related to [MBT's] loan portfolio will likely occur." *Id.* at 15. It cautioned that the Bank was not well-capitalized, would "likely need to raise additional capital," could not assure investors of its "ability to raise additional capital if needed on favorable terms," and could face a "materially impaired" ability to operate if it was unable to raise additional capital. *Id.* at 16.

Finally, with respect to MBT's ALLL calculations, the offering memorandum warned that the Bank's earnings would decrease if its ALLL reserve was not sufficient to cover actual loan losses. *Id.* at 19. It noted that loans were a particularly important component of the Bank's assets and that it had already experienced significant loan losses that had adversely affected its operating results. After explaining that MBT's ALLL calculation was based on various assumptions and

judgments, the PPM cautioned that if the Bank's assumptions were wrong, the "current allowance may not be sufficient to cover future loan losses," and the Bank made "no assurance that [its] allowance will be adequate to cover future loan losses given current and future market conditions." *Id.* at 19.[6]

### E.    June 2010: Price Meets with MBT and Makes Contact with Defendants

On June 15, 2010, Price traveled to MBT and met with its president, Trae Dorough, and another Bank employee, Wendell Dixon, to discuss the possibility of investing in the Bank. As noted above, there is no dispute that Price had reviewed the C&D Order prior to this meeting and that at the meeting Dorough and Dixon gave him a copy of the PPM and the Kline report, which he also reviewed.

Two days after his meeting with MBT, Price sent an email to the McSwains about MBT. Price stated that he was "[j]ust crunching some

---

[6] In a prior lawsuit brought by Damian against the Bank's officers and directors for alleged violations of the federal securities laws, Damian asserted that the PPM vastly understated MBT's ALLL. In March 2015, the Court dismissed that case after holding, among other things, that Damian had failed to establish that the ALLL figures reported in the PPM were false or misleading. *Damian v. Montgomery Cty. Bankshares, Inc.*, No. 1:12-cv-4472-TCB, 2015 WL 11199067 (N.D. Ga. Mar. 31, 2015).

initial numbers" and noted that there were "a number of scenarios" that the investors needed to "think through," "[i]ncluding running numbers to compare compensation, expenses and projected revenues based on various growth strategies." [53-5] at 109. In another email to the McSwains the following day, Price confirmed that he was working with a research analyst and a CPA to "break[] down all the numbers." *Id.* at 112.

On or around June 22, 2010, Price notified his investors that he had reached out to Defendants about possible legal representation in connection with the bank investment:

> Lastly, I have a conference call with Brennen [sic] Ryan on Friday at 1:00 pm to go over the summary of banks discussions and regulatory/legal questions. He is the premier banking attorney for the Southeast and knows the details on almost every deal occurring around the south and how we should structure based on current and possible banking regulations.

*Id.* at 114.[7]

---

[7] The parties do not dispute that since approximately 2004, Nelson Mullins had publicly advertised its "extensive experience in the formation, acquisition, and divestiture of bank holding companies, state and national banks, and branches of banks and savings and loan associations." [53-4] at 17.

On June 25, Price sent an email to Ryan summarizing some of

what the investors knew about MBT:

> **Bank #2: Smaller Community Bank currently under C
> and D**....about 240 million in assets; 35,700 shares
> outstanding; 10,000 shares offered at 100.00 each...they have
> sold 4 million with 1 million more in commitments. We are
> negotiating a discounted price for a 50.1% ownership stake.
>
> Question is if the bank becomes a healthy viable entity
> again, will this allow us to bid on certain FDIC future
> auctions if there are synergies?

[55-11] (ellipses and emphasis in original). Price and Ryan later spoke

on the phone for about half an hour that afternoon. *See* [53-4] at 2.

Shortly after Price's call with Ryan, Price emailed Dorough and

Dixon requesting permission to "read any consent orders from the FDIC

or Regulators" and "review the last regulatory exam" of MBT. [53-6] at

66. Price explained that he was "most interested to know how

[regulators] rated the bank in various classifications (compliance,

capital, asset quality, management team, liquidity)" because that

information was "important to understand in order to get regulatory

approval for any transaction." *Id.* He "also want[ed] to measure how

quickly MBT could move into an aggressive strategic position with

regulatory approval." *Id.* Dixon pointed Price to the C&D Order on the FDIC's website, and Price acknowledged that he had read it and was "working off that one already." *Id.*

Price again met with Dorough and Dixon at the Bank on July 1, 2010. An email sent by Dixon to Dorough and MBT director Pete Robinson on June 28 stated that the purpose of the upcoming visit was for Price and Gunter "to do the due diligence on [the Bank's] numbers." [53-6] at 69. Dixon told Robinson that Daniel McSwain had led him to believe that Price and the other investors were "sold on the bank . . . if the numbers don't look too bad to them." *Id.*

## F.  July 2010: Defendants Are Retained and PFGBI Is Formed

In early July 2010, an engagement letter was signed by Price and Defendants pursuant to which Defendants were retained as legal counsel "in connection with certain legal matters that may arise from time to time." [53-4] at 26.[8] The letter does not expressly address any

---

[8] The engagement letter, which was written before PFGBI had been formed as an entity, identifies PFG Asset Management as Defendants' client. There is no dispute, however, that once PFGBI was formed, it became Defendants' client even though no separate engagement letter was ever signed. It is equally undisputed that Price himself was never personally a client of Defendants.

14

specific purpose of the representation, nor does it purport to limit the representation in any way.

Later that month, PFGBI was formed with more than a dozen members, including Price, the McSwains, and Gunter. Price and the PFG Entities contributed almost ten percent of PFGBI's funds; the remaining ninety percent came from other investors. *See* [55-10] at 4. Defendants knew that Price had no prior experience with or significant knowledge regarding structuring an investment in a bank. However, Ryan testified that Price "was very clear that he had significant knowledge about analyzing assets in these banks and brought all this expertise to the table." *See* [51-9] at 55; *see also id.* at 203–04. Ryan believed Price to be a sophisticated individual with significant experience in real estate but who needed some guidance as to the best way to acquire a controlling interest in a bank. *Id.* at 53.

## G.    August–December 2010: Due Diligence

After Defendants were retained as counsel and PFGBI was formed, the parties engaged in due diligence as the transaction prepared to move forward. Though it is impossible to detail each and

every action taken by the parties during this time, some of the key aspects of the diligence process are summarized below.

Defendants prepared an investment checklist [54-6] that Wolfersberger described as an "internal" list of tasks that needed to be completed "to complete the regulatory filing" in connection with PFGBI's acquisition of a controlling interest in Bankshares. [51-10] at 101. PFGBI, alone or in conjunction with MBT, Bankshares, and/or Defendants, was identified as the responsible party for at least eight items on the checklist, including the stock-purchase agreement and the required application to become a bank holding company. For several of the items on the list, including due diligence, no responsible party was identified.[9]

On August 3, 2010, Wolfersberger sent Price an initial draft of the stock subscription agreement and directed Price's attention to certain particular sections of the document. With respect to the Bank's loan portfolio, Wolfersberger wrote: "Please review Section 3(t) in detail. This

---

[9] Wolfersberger could not specifically recall whether the investment checklist had been shared with Price in this case, although he testified that it was the firm's general practice to share such items with clients. [51-10] at 101.

is the bank's representation with respect to the loan portfolio. Based on your diligence, you may want to modify this provision to address specific concerns with respect to this transaction." [60-12] at 137.

On August 11, Wolfersberger traveled to MBT to, as he described it, "conduct legal due diligence." [53-7] at 159. He reviewed numerous documents and billed 12.5 hours for his work on tasks such as reviewing diligence, conferring with Bankshares's counsel regarding diligence, and preparing a due diligence memorandum. [54-3] at 3. Dorough and Price were both present at the Bank that day, and Price periodically came into the room where Wolfersberger was reviewing documents and "flipped through stuff" on his own. [51-10] at 111. On August 13, Ryan billed 2.2 hours for time spent "[r]eview[ing] due diligence" and on a "conference call with client regarding due diligence and pricing," among other tasks. [54-3] at 3.

Among the documents Wolfersberger reviewed were the minutes of MBT's board of directors' meetings. The minutes of the board meeting that had taken place on August 10 revealed that on that day—one day prior to Wolfersberger's visit, and the same day that bank regulators

17

were on site at MBT to conduct an examination—the directors and officers had unanimously voted to retain the law firm of Alston & Bird to represent them in their individual capacities. According to the August 10 minutes, Robinson had urged the board to prepare for the Bank to be put under FDIC receivership, despite the hope that had been generated by the possibility of an investment in the Bank. Significantly, Price too reviewed these minutes, although he contends that he only "glanced through them." [56-5] at 56.

The August 2010 board minutes, as well as the minutes from February and May 2010 meetings, contained information about loan reviews performed by Steve Powell, an independent loan reviewer. [55-15] at 2, 30. Powell's report for the second quarter of 2010 stated that MBT had "experienced a drastic decline in asset quality since the last review" and was expected to "experience further deterioration in its asset quality as the market weakness persists and non-performing assets are worked-out of the Bank." [54-27] at 15. It also contained information indicating that the Bank's financial health had further declined since the April 2010 PPM: adversely graded assets had

increased to $75.1 million, including $51.2 million in loans and $23.5

million in REO. Powell's Q2 2010 report further detailed the possibility

that one of the Bank's borrowers was kiting loan-payment checks, and it

identified violations of regulatory requirements for loan approvals. *Id.*

at 10–11.

On August 16, Wolfersberger contacted MBT's counsel to request

assistance in scheduling a "diligence call" with MBT's auditors, the firm

of Thigpen Jones. Wolfersberger passed Thigpen Jones's contact

information along to Price and asked whether Price wanted Defendants

to participate in the call, suggesting that the auditors may be more

open if lawyers were not on the call. [54-12]. Price did not request that

Defendants participate in the call, but asked them to "forward any

questions you think are most relevant," indicating that he was "going to

try to find out the exact amounts we need to get to the 8% capital ratio"

and that Dorough would have to be on the call as well because Thigpen

Jones would "not have 2010 numbers in front of them." *Id.*

Wolfersberger emphasized to Price that the auditors' input was "critical

for you to determine the value of the company and the equity." *Id.*

On August 26, Price forwarded MBT's June 2010 call report and ALLL calculation to Wolfersberger and asked him for his "view of the bank equity based upon these latest financials." [54-13]. Wolfersberger forwarded that email to Ryan, seeking clarity about what Price wanted and noting that "[f]inancial analysis of the bank is really not [Wolfersberger's] expertise." [54-14]. Defendants contend that the exchange that ensued was in jest: Ryan told Wolfersberger that he was "a trusted advisor now," and Wolfersberger responded that he could "google to figure out how to calculate" the Bank's equity. *Id.*

In the meantime, Price continued to crunch his own numbers, and he sent another email to Wolfersberger that contained his calculations of the Bank's equity and total risk-based capital. [54-15]. The email asked if Wolfersberger agreed, but it also indicated that Price was seeking another opinion from a CPA. Wolfersberger reviewed the call report, compared those numbers to Price's numbers, and responded that his numbers were "close but not exactly the same," opining that there were "probably some subtle nuisances [sic] from an accounting

perspective for calculating total risk based capital" and advising Price to "get confirmation from the company and the accountants as well." *Id.*

Billing records for August 26, 2010 reflect that Wolfersberger billed PFGBI for, among other tasks, "review[ing the Bank's] call report and calculat[ing] financial ratios." [54-3] at 4. Both Ryan and Wolfersberger testified that Wolfersberger was not qualified to give advice about interpreting financial statements, and Ryan further testified that calculating financial ratios was not within the scope of Defendants' representation of PFGBI. However, Ryan also testified that while neither he nor Wolfersberger could "attest to the underlying portion" of the bank's financial statements and equity, they "could refer [Price] in the call report to a very specific line item that has that equity ratio in it." [51-9] at 105.

On August 30, Wolfersberger advised Price to "confirm [Price's] loan analysis with [MBT's] accountants" to avoid any "surprises" after closing and allow Price to "determine how much [he was] willing to pay for a controlling interest of this bank . . . ." [55-18]. That email further referred to the Bank as being in a "dire situation." *Id.* Later that same

day, Ryan or Wolfersberger told Price in another email that "it is perfectly reasonable and a good idea in this context to ask the company and their auditors for the capital ratios to confirm [Price's] analysis." *Id.*

The Board of Governors of the Federal Reserve System requires that applicants seeking to acquire a majority interest in a bank or a bank holding company complete the FR-Y-3 Application to Become a Bank Holding Company. PFGBI submitted such an application on October 4, 2010. *See* [54-10]. Defendants asked for Price's assistance in preparing the FR-Y-3 application, particularly with respect to describing "the extensive diligence procedures [Price] undertook." [53-8] at 12.

On November 18, regulators advised—on a conference call in which Price and Defendants participated—that additional capital had to be raised by the end of the year for the transaction to be approved. On November 29, Wolfersberger asked Price to provide "a detailed report" concerning "the due diligence conducted by PFGBI" that could be provided to regulators to supplement PFGBI's application. [60-3] at 244. He also advised that regulators were "particularly concerned about

22

the amount of [non-performing assets] in relation to the current reserve." *Id.* Price responded that he would forward the requested items as soon as they were completed. *Id.*

Defendants supplemented PFGBI's FR-Y-3 application on December 3, 2010. *See* [54-24]. The supplement included a "business plan" that included a list of the Bank's nonperforming loans, which totaled approximately $30 million. *See* [54-24].

## H.   The Bankshares Transaction Closes, and Price Squanders Millions of MBT's Funds Before His Scheme Unravels

On December 3, 2010, a revised term sheet was signed by Dorough (as president of MBT) and Price (as manager of PFGBI). The "non-binding" terms in that document provided that PFGBI would receive 10.2 million shares of Bankshares common stock in exchange for a purchase price of $10.2 million, and that MBT would sell 4.2 million shares of common stock at $1 per share in a separate private placement (not involving PFGBI). It further stated that the transaction was subject to, among other thing, the "completion of due diligence, the result of which are [sic] satisfactory to PFGBI." [55-21].

23

On December 29, 2010, the Federal Reserve approved PFGBI's application to become a bank holding company, the last hurdle to the transaction's closing. *See* [53-15] at 32. On December 31, the $10.2 million from PFGBI investors was sent to Bankshares, net of expenses. At 1:15 p.m. on that date, the Bank reported that it had received $10,093,583.78 from PFGBI and $3,918,452.06 from other investors, for a total capital infusion of $14,012,035.84.

In January 2011, Price—who was made a director of MBT and managed the Bank's investment portfolio following the closing of the Bankshares transaction—directed the first transfer of funds out of MBT to a Goldman Sachs account in PFG's name. Over the next eighteen months, Price would squander almost $15 million of MBT's funds through misappropriation, embezzlement, and/or speculative trading. Damian concedes, as she must, that Price's actions in this regard further reduced the Bank's liquidity. In an attempt to conceal his fraud, Price provided MBT with falsified account statements beginning in February 2011.

In mid-2012, Price's conduct had not yet been discovered, but his scheme was beginning to unravel. On or around June 18, he authored a document titled "confidential confession for regulators" and sent it to the Securities and Exchange Commission ("SEC") as well as some personal contacts. He then faked his own death by making it appear as though he had jumped off a ferry in south Florida. Price was presumed dead—and eventually pronounced so by a Florida court—until December 2013, when he was discovered alive during a routine traffic stop in south Georgia.

Only after Price's disappearance did the extent of his fraud come to light. It was learned that Price's fraudulent activity dated back to at least mid-2009, around the time that PFG began soliciting investment funds. Just as Price provided falsified statements to MBT to conceal his actions there, he had provided falsified account statements to his PFG investors as well. Some of those falsified statements were provided to regulators in connection with the 2010 Bankshares transaction. There is no dispute that Defendants were unaware of Price's fraudulent

conduct, nor is there any suggestion that they should have become aware of it in connection with the PFGBI representation.

On July 2, 2012, the SEC filed an enforcement action against Price and the PFG Entities. *SEC v. Price*, No. 1:12-cv-2296-TCB (N.D. Ga. filed July 2, 2012). Four days later, on July 6, regulators closed MBT, and a judge of the Superior Court of Montgomery County appointed the FDIC as receiver for the Bank. [53-18] at 14.

In 2014, after it was discovered that Price had faked his death, criminal charges were brought against Price in the United States District Court for the Southern District of Georgia. On June 1, Price pled guilty to securities fraud, wire fraud, and bank fraud. [53-4] at 335–354. He was sentenced to fifty years in federal prison and ordered to pay $14.7 million in restitution to the FDIC, $27.9 million in restitution to individual investors, and $173,000 in restitution to the United States Coast Guard, which conducted search operations after Price led people to believe that he had jumped off the Florida ferry.

26

## III.   Discussion

### A.   Legal Standard: Motion for Summary Judgment

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242–43 (N.D. Ga. 2014); *Mobile Cty. Water, Sewer & Fire Prot. Auth., Inc. v. Mobile Area Water & Sewer Sys., Inc.*, 567 F. Supp. 2d 1342, 1348 (S.D. Ala. 2008) ("The applicable Rule 56 standard is not affected by the filing of cross-motions for summary judgment.").

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this

determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex Corp.*, 477 U.S. at 324). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 323).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must "'go

beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting *Celotex Corp.*, 477 U.S. at 324).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it 'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" *Four Parcels of Real Prop.*, 941 F.3d at 1438 (quoting *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting)). "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting)).

## B.    Duty Owed by Defendants to PFGBI

The first prong of a legal malpractice claim looks to the existence of an attorney-client relationship, which is "essential in establishing the element of duty that is necessary to every lawsuit based upon a theory of negligence." *Guillebeau v. Jenkins*, 355 S.E.2d 453, 457 (Ga. Ct. App. 1987); *see also City of Rome v. Jordan*, 426 S.E.2d 861, 862 (Ga. 1993) (noting that in any negligence action, the threshold question is "whether, and to what extent, the defendant owes the plaintiff a duty of care"). The existence and scope of a legal duty is a question of law. *City of Douglas v. Hudson*, 726 S.E.2d 496, 498 (Ga. Ct. App. 2012).

There is no dispute that an attorney-client relationship existed between Defendants and PFGBI, but the parties dispute the nature and scope of the duties that Defendants undertook to provide on behalf of their client, specifically with respect to due diligence. Defendants contend that their representation obligated them to perform only "legal due diligence," i.e., diligence necessary to ensure that the Bankshares transaction could be completed, with regulatory approval.

Damian responds that this is too narrow a definition of Defendants' due diligence responsibilities. She faults Defendants for failing to do what Defendants refer to as "financial due diligence," i.e., failing to inquire into MBT's financial health in order to determine whether the Bankshares transaction was advantageous to PFGBI and whether MBT's representations concerning its finances were accurate.

The Court begins its analysis by rejecting any suggestion that every transactional attorney owes a duty to opine on the merits of the deal. Even in the context of an otherwise unlimited representation, a lawyer is not obligated to second-guess a client's business judgment or "protect the client from his or her own limited business expertise." 1 RONALD E. MALLEN WITH ALLISON MARTIN RHODES, LEGAL MALPRACTICE § 8:7 (2016); *see also In re Greater Se. Cmty. Hosp. Corp.*, 333 B.R. 506, 529 (Bankr. D.D.C. 2005) (dismissing legal malpractice claim and noting that the scope of the attorney-client relationship "does not include *business* advice"); *Lamb v. Barbour*, 455 A.2d 1122, 1126 (N.J. Super. Ct. App. Div. 1982) ("Plaintiffs' reliance on defendant's background in tax law and accounting did not justify the expectation of

31

counseling as to the prudence of the course they had chosen. This decision was properly left to the exercise of plaintiffs' business judgment.").

Damian appears to suggest otherwise, but she cites no supporting legal authorities, and her own expert testified that he has never given a legal recommendation to one of his clients about whether they should proceed with an investment. [51-4] at 34. For this reason, although the Court agrees with Damian that Defendants never limited the scope of their representation of PFGBI, that fact alone is not dispositive with respect to the scope of the duty owed by Defendants.

However, this is only the beginning of the Court's inquiry into the scope of Defendants' representation. The attorney-client relationship is contractual in nature, and "an attorney's duty to his or her client corresponds to the undertaking." *Kan. Pub. Emps. Ret. Sys. v. Kutak Rock*, 44 P.3d 407, 492 (Kan. 2002); *accord McMann v. Mockler*, 503 S.E.2d 894, 897 (Ga. Ct. App. 1998). "One who undertakes to perform a task must perform it in a non-negligent manner." *Crockett v. Uniroyal, Inc.*, 772 F.2d 1524, 1531 (11th Cir. 1985). Even though a duty to

conduct so-called financial due diligence does not inhere as a matter of law in every legal representation, there exists in this case a genuine issue of material fact as to whether Defendants voluntarily assumed such a duty in connection with the Bankshares transaction.

There is no dispute that before Price ever approached Defendants, he had begun conducting some due diligence of his own into MBT. He crunched some initial numbers of his own, and he worked with a research analyst and a CPA to understand the significance of those numbers. Even after Price retained Defendants, he continued to communicate with Bank representatives and auditors without copying his attorneys; he met with Bank representatives without his attorneys present; and he participated in periodic meetings and conference calls—both with Bank representatives and his PFGBI investors—during which the Bank's non-performing assets (including its problem loans) were discussed at length. Defendants' communications with Price even expressly referred to the "diligence" performed by the client with respect to the Bank's loan portfolio. [60-12] at 137.

Price also told the McSwains and Gunter that he had contacted Ryan for advice about "how [the investors] should structure [the deal] based on current and possible banking regulations," [53-5] at 114, and after Price and Ryan spoke on June 25, 2010, Price asked Dorough and Dixon to provide information that was important for the transaction "to get regulatory approval." [53-6] at 66. This evidence, especially when coupled with Defendants' testimony, if credited, would support a finding that the parties mutually understood that PFGBI, not Defendants, bore responsibility for investigating MBT's finances.

But there is conflicting evidence in the record from which a jury could also find that Defendants did undertake to conduct what they now refer to as financial due diligence and/or that they led their client to believe that they were doing so. Defendants billed PFGBI for tasks such as reviewing the Bank's call reports, calculating financial ratios, and reviewing financial statements and reports. [54-3]. Most notably, when the PFGBI investors sought advice from Defendants regarding the Bank's finances—including in August 2010, when Price asked for Defendants' "view of the bank equity based upon" MBT's June 2010 call

report and ALLL calculations," [54-14]—Defendants offered substantive responses instead of cautioning their client that any opinions regarding the Bank's finances were outside Defendants' area of expertise or the scope of the representation. Defendants did, however, advise Price on several occasions to obtain confirmation regarding the Bank's finances from the Bank itself and its accountants and auditors. *See*, *e.g.*, [54-15]; [55-18].

The record before this Court is replete with conflicting evidence about "the task for which [Defendants were] employed." *Tante*, 453 S.E.2d at 695. The bright line Defendants attempt to draw between legal and financial due diligence was blurred on many occasions, but a finding that Defendants undertook to perform at least some of the tasks they characterize as financial due diligence would merely be permitted, not compelled. Indeed, the parties' concomitant attempts to point to purportedly undisputed evidence about Defendants' duties serve to highlight the existence of genuine issues of material fact. *See generally Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (noting that although the filing of cross-motions for summary judgment "may be

probative of the nonexistence of a factual dispute" under some circumstances, that is not the case when "the parties disagree as to the facts and take inconsistent legal theories").

These fact questions preclude summary judgment in favor of either party on the issue of the scope of the duty owed by Defendants to PFGBI. *See Arthur Pew Constr. Co. v. First Nat'l Bank of Atlanta*, 827 F.2d 1488, 1493 (11th Cir. 1987) (reversing summary judgment where record contained a question of fact as to whether the defendant voluntarily assumed a particular duty).

### C.    Proximate Cause

Whatever questions of fact exist with regard to the scope of Defendants' duty, the evidence is decidedly less equivocal with respect to the question of proximate cause. Even when viewed in the light most favorable to Damian, the undisputed evidence leads to the conclusion that any negligence by Defendants is too remote from PFGBI's losses to be causally connected thereto.

As with any tort claim, "[a] client may recover for legal malpractice only if the negligence of the attorney is the proximate cause

of damages to the client." *Crowley v. Tr. Co. Bank of Middle Ga., N.A.*, 466 S.E.2d 24, 25 (Ga. Ct. App. 1995). "The concept of proximate cause acts as a limitation on what would otherwise be the unlimited liability of a negligent tortfeasor for all the immediate and the eventual consequences of his negligence." *White v. Rolley*, 484 S.E.2d 83, 86 (Ga. Ct. App. 1997) (internal punctuation omitted). A client's harm is proximately caused by his attorney's negligence only when the injury is "the natural and probable consequence of the negligence, such a consequence as under the surrounding circumstances of the case might and ought to have been foreseen by the wrongdoer as likely to flow from his act." *Duncan v. Klein*, 720 S.E.2d 341, 347 (Ga. Ct. App. 2011).

The Bankshares transaction closed on December 31, 2010, in the midst of a difficult economic climate for local banks. At every stage of the transaction, it was clear that the Bank faced significant hurdles, particularly with respect to its loan portfolio and the fact that its success was disproportionately linked to the performance of the troubled real estate market. Indeed, MBT's distressing state of affairs

in 2009 and 2010 was precisely what attracted Price and his investors to it as an investment opportunity.

After the deal closed, MBT continued to operate for eighteen months. During that time, it continued to make loans, publish quarterly call reports, issue progress reports regarding its compliance with the C&D Order, and be subjected to regulatory examinations and Steve Powell's loan reviews. Beginning in January 2011, MBT and its assets also fell prey to the criminal conduct of its new director, Price. During 2011 and the first half of 2012, Price lost millions of MBT's funds, further reducing the liquidity of the already troubled bank. There is no suggestion that Price's conduct was foreseeable by Defendants. *See Walker v. Giles*, 624 S.E.2d 191, 200 (Ga. Ct. App. 2005) (noting that only intervening acts that are unforeseeable by the defendant will sever proximate cause).

MBT was eventually shut down on July 6, 2012. Significantly, this was after Price's confession surfaced and just four days after the SEC filed its lawsuit against Price, PFGBI, and the other PFG Entities. PFGBI's investment was lost only at the point when the Bank was

38

closed and there was no longer any opportunity for it to rebound from its distressing times.

While Damian faults Defendants for failing to alert Price to particular pieces of information relating to MBT's financial situation, it is undisputed that they advised Price that the Bank was in a "dire situation" [55-18] and that Price had access to and in fact reviewed many documents that confirmed that. It is undisputed that he reviewed the C&D Order, Kline's report, and the offering memorandum in June 2010, long before PFGBI invested in the Bank. He also had access to the Bank's quarterly call reports before the transaction closed. These documents, taken individually and collectively, detailed the Bank's hazardous lending practices, deficient capital, and inadequate ALLL. They also predicted that the Bank would continue to suffer further losses going forward, and they detailed the manner in which the Bank's success was (perhaps inordinately) tied to the performance of the real estate market.

In August 2010, Price also reviewed the meeting minutes of the Bank's board of directors, which revealed that the directors had voted to

retain individual counsel and acknowledged the possibility that the

Bank would be put under FDIC receivership. Those minutes also

referred to the Powell reports, and Price's handwritten notes on Kline's

March 2010 PowerPoint presentation read "Steve Powell & Co.—Loan

Review."[10]

Assuming, for the moment, that Defendants were negligent in

their representation of PFGBI and that such negligence facilitated the

closing of the Bankshares transaction, that negligence is still so remote

from PFGBI's losses that any causal connection is speculative at best.

Proximate cause demands more than speculation or the mere possibility

of causation. *Pettigrew v. Citizens Tr. Bank*, 229 B.R. 39, 42 (N.D. Ga.

1998).

Instead, the evidence of record shows that the loss of PFGBI's

investment was caused by the intervening decision of Price—the man at

the helm of PFGBI, in whose shoes Damian stands—to defraud and lie

to the Bank's officers and directors, his own investors, Government

---

[10] While it is true that Price's notes are undated, under the totality of the circumstances, it is unreasonable to infer that Price was unaware of the Powell loan reviews prior to the closing of the Bankshares transaction.

regulators, and even Defendants themselves. *See Hays v. Page Perry, LLC*, 92 F. Supp. 3d 1315, 1324 (N.D. Ga. 2015) (dismissing a receiver's legal malpractice claim for lack of proximate cause where the losses complained of were caused by the receivership entity's principal's "deliberate choice to flout applicable regulations, lie to his attorneys, and continue his fraudulent scheme").

Damian argues that even though PFGBI's losses were not realized until July 2012, those losses were suffered immediately because at the time the transaction closed the Bank was not salvageable. But the Court previously excluded her expert testimony to that effect. *See* [87] at 16–20. It would invite speculation—and create an unreasonable specter of liability for transactional attorneys—to hold that a business was past the point of no return when its acquisition was approved by Government regulators, it continued to operate for a year and a half after closing, and it eventually ceased operations just days after the fraudulent and criminal activity of one of the business's own directors came to light.

The Court recognizes that "issues of proximate cause are reserved for the jury except in plain and unequivocal cases." *Jenifer v. Fleming, Ingram & Floyd, P.C.*, 552 F. Supp. 2d 1370, 1379 (S.D. Ga. 2008). But those "plain and unequivocal cases" are not rare, as Georgia courts have on numerous occasions ruled as a matter of law that an attorney's malpractice, if any, did not proximately cause his client's losses. *See, e.g.*, *Hays*, 92 F. Supp. 3d at 1324; *Mitchell v. Smalley*, No. 4:12-cv-300-HLM, 2014 WL 12480029, at *9 (N.D. Ga. Feb. 6, 2014); *Watkins v. Capital City Bank*, No. 310-087, 2012 WL 12929768, at *8 (S.D. Ga. Sept. 24, 2012); *Pettigrew*, 229 B.R. at 42; *Kramer v. Yokely*, 662 S.E.2d 208 (Ga. Ct. App. 2008); *Oehlerich v. Llewellyn*, 647 S.E.2d 399 (Ga. Ct. App. 2007); *Studio X, Inc. v. Weener, Mason & Nathan, LLP*, 624 S.E.2d 157 (Ga. Ct. App. 2005); *White*, 484 S.E.2d at 86. Under the unique and complex facts of this case, the undisputed evidence of record compels the conclusion that proximate cause is lacking. Defendants are therefore entitled to summary judgment.

## IV.    Conclusion

For the foregoing reasons, Defendants' amended motion for summary judgment [89] is granted, and Plaintiff's amended motion for summary judgment [90] is denied.

IT IS SO ORDERED this 28th day of September, 2017.

Timothy C. Batten, Sr.
United States District Judge